In re MUSICA et al.

PRENTICE v. MUSICA.

(District Court, S. D. New York. February 9, 1920.)

1. BANKRUPTCY ⊜250(1)—BURDEN HELD TO REST ON AGENT OF BANKRUPTS TO ACCOUNT FOR RECEIPTS.

Where it is shown that bankrupts were engaged in extensive schemes to defraud, that respondent, wife of one and mother of the other bankrupt, and associated in such schemes, went to Italy and while there received as their agent, through such fraudulent schemes, large sums of money, some of which, received shortly before their bankruptcy, was clearly not remitted, the burden of accounting for all such receipts *held* to rest upon her.

2. WITNESSES ⊜362—TESTIMONY OF FRAUDULENT BANKRUPTS UNWORTHY OF CREDENCE.

Where it is shown beyond question that bankrupts and members of their family were engaged in extensive schemes to defraud, continued until their arrest, the court is justified in refusing to give credence to their testimony.

In Bankruptcy. In the matter of Antonio Musica and Philip N. Musica, individually and as copartners, as A. Musica & Son, bankrupts. On petition of Eura P. Prentice, trustee, to review order of referee. Reversed.

Edwin T. Rice, of New York City, for trustee.
Joseph Force Crater, of New York City, for respondent.

MAYER, District Judge. The referee has denied the trustee's application to compel respondent to pay over a balance of moneys received by her as the agent of the bankrupts in Naples, Italy. This proceeding is brought to review the referee's order.

The bankruptcy is a record of frauds involving large sums of money, and the actors were members of the Musica family and their relatives.

---

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
[1] Hurley's, Awakening of Business.

In October, 1910, Assunta Musica, the wife of Antonio and mother of Philip, went to Naples with her younger children. It is fair to assume that she went abroad for the purpose of assisting Antonio and Philip in negotiating fraudulent drafts.

The Musicas were large dealers in human hair, and apparently stood high in their branch of the commercial world. Mrs. (Assunta) Musica, in Naples, bought hair waste, sweepings, and combings—referred to in her correspondence with Antonio and Philip as "gettatura"—and this material was packed in cases, invoiced as valuable hair, and upon the issue of bills of lading drafts were negotiated by Assunta Musica with banking institutions and bankers, in which the fraudulent invoices were used to procure substantial discounts. Thus cases containing "gettatura," costing a trifle, were used as collateral for drafts drawn for many times the actual amount. Between July 1, 1912, and March 13, 1913, the face amount of the drafts negotiated by Assunta Musica was $1,036,903.97. Of this amount, the trustee demanded that Assunta Musica pay over the sum of $418,288.56; but, after tracing and checking up data and thus allowing certain credits, the amount in controversy has been reduced to $208,838.97.

The trustee and his counsel have developed the figures involved with great care and detail. Attached to the trustee's petition are four schedules, summarizing the transactions of Assunta Musica for a period of eight months prior to the bankruptcy, as follows:

Schedule A is a list of drafts negotiated by Assunta Musica, aggregating $1,036,903.97.

Schedule B is a list of remittances made to Assunta Musica by the bankrupts.

Schedule C is a list of cable transfers made to the bankrupts by Assunta Musica under the name of A. de Rosa.

Schedule D is a list of drafts drawn by the bankrupts on Pasquale Testamento (Assunta Musica's brother-in-law, a harness maker in Naples and one of the accomplices), and paid by Assunta Musica.

The record clearly shows a complete scheme to defraud the banks and bankers, with Antonio and Philip Musica in New York, and Assunta Musica, Testamento, and one Siniscalchi in Naples. Undoubtedly Philip was the brains and originator of the scheme; but the mother, this respondent, was plainly a participant. This conclusion is borne out by correspondence, and by the nature of the transactions, and by all the surrounding circumstances. The testimony that one de Rosa was the active agent of the bankrupts in Naples may be disregarded, and is wholly unsupported by any credible corroborating fact or circumstance.

If, then, a given amount of money is traced into the hands of Assunta Musica, the burden is upon her to account therefor; and, where the parties concerned have been engaged in so daring and shrewdly executed a series of fraudulent transactions, exculpatory testimony offered by themselves must, of course, be regarded with caution.

William Eisenhardt, an accountant, was sent to Europe in February, 1914, by the trustee, with the approval of the creditors. He made investigations which carried him to various European cities, and then

in June, 1914, he made a second visit. The task of building up an account was difficult, as such tasks usually are in the case of extensive frauds, and especially when records and papers have disappeared. The figure of $418,288.56 seemed to be correct with the data at hand when the trustee filed his petition, but before Eisenhardt testified credits were found which reduced the unaccounted funds to $208,838.37.

A series of events combine to lead to the conclusion that this balance has not been accounted for by any reasonable explanation. It will be remembered that Assunta Musica went to Italy in the fall of 1910. Out of the mass of correspondence is the significant message sent by the bankrupts to respondent under date of September 5, 1912 (Trustee's Exhibit A83), as follows:

"Retain funds Naples with Assunta. Withdraw 180,000 frs. Draw Aug. 27th at 10 days' sight."

On April 17, 1913, the bankruptcy adjudication was made in this court. Some five weeks before that, Antonio and Philip, with four members of the family, had fled. On March 19, 1913, they were apprehended in New Orleans and taken from a steamer on which they were about to sail for Central America. On March 12, 1913, Assunta negotiated a draft with the Banca di Roma upon which she obtained 140,000 lire, the equivalent at that time of $27,000+, in round numbers. In the Italian criminal court, where Assunta Musica was examined in June, 1913, she was unable to account for this sum of 140,000 lire. There she testified, inter alia:

"The 140,000 lire which I collected from the Banca di Roma on the day I left Naples, viz. on the 11th or 12th of March, I can't tell at this moment how I spent it, for I don't remember, but I certainly didn't squander that money. * * * I cannot determine the amount, but I reserve myself the right to present in a later statement showing how I spent the 140,000 lire which I collected."

So that, within three months of the bankruptcy, Assunta Musica was unable to account for so substantial a sum as 140,000 lire, and this record fails to disclose any adequate explanation since. The last cable sent from New Orleans, just as Antonio and Philip were being apprehended, read:

"Received cable. Did you hide Piselli? If you should receive telegrams in the name of our first sister destroy addresses. Suspend communications. Policemen are following arresting us. Look out. Be careful. Protect yourself. Telegraph in a reverse manner. Adams & Generally, 418 Newen Building, New Orleans."

"Piselli" meant money. Adams & Generally were the attorneys of the Musicas.

[1] The foregoing brief references, taken with all the correspondence and testimony, demonstrate that some money, in any event, was retained by Assunta, and certainly there is no escape from the conclusion, owing to the dates, that the 140,000 lire were never remitted to the bankrupts.

It is not the duty of the trustee to trace the disposition of the remainder. He has shown that the balance of $208,838.37 was in the hands of Assunta. She must account for this sum. This she could

do by showing (1) a draft purchased; (2) a cable transfer purchased; (3) a draft paid; or (4) a bill paid. Of all such transactions a record of some kind would normally be kept. The trustee's accountant has been unable to reduce the unaccounted amount below the balance above mentioned.

Philip Musica testified he "had destroyed everything he could lay his hands on," and no writings of any kind from Assunta to the bankrupts have been found, other than the cable messages in evidence. Assunta Musica did not return to the United States until July, 1916, and for six months she succeeded in evading service, although an order for her examination was issued within a week of her arrival. She thus had from March, 1913, until at least January, 1917, to dispose by secret methods of any money she had hidden, either for her own purposes or those of her family.

[2] The referee concludes his opinion as follows:

"In this proceeding before me, on an application on behalf of Assunta Musica that the trustee be directed to answer certain interrogatories, an affidavit by Philip M. Musica was filed, in which he stated under oath that 'the nature and character of the services rendered by respondent to the bankrupts were such that she could not retain any records or assets whatsoever of the bankrupts, but transmitted them to deponent, all of which deponent acknowledges to have received'; that Assunta Musica 'turned over to deponent all her records and vouchers pertaining to said accounting, and that said records, vouchers, and information are now in possession of the plaintiff [i. e., the petitioner], or his agents or custodians, excepting the correspondence which deponent destroyed before his departure from New York.' Further said Philip M. Musica in said affidavit alleged as follows: 'I solemnly swear that respondent is not indebted to the bankrupts in any amount.'

"Thus we have the admission under oath of Philip M. Musica that he or the bankrupts received from Assunta Musica all the assets of Musica & Son which passed through her hands, and the statement of Assunta Musica that she paid over to Musica & Son, or to their use, all the moneys that came into her hands. It is more probable that Philip M. Musica, who originated and was the chief actor in accomplishing these frauds, or the bankrupts, have concealed moneys representing the proceeds thereof, than that Assunta Musica has done so. The proof that any of these moneys were concealed and retained by Assunta Musica is not of that convincing and satisfying character which the rules laid down by the court in cases of this kind require."

I am unable to give credence to an affidavit of Philip Musica, for the reasons (1) that his whole conduct of most reprehensible frauds characterizes him as presumptively unworthy of belief; and (2) that he would naturally go far to extricate his mother from the position in which his evil ability had placed her. In such circumstances, the voluntary admission by a bankrupt that she had paid over the money is worthless. The case is well within the authority of such cases as In re Meier, 182 Fed. 799, 105 C. C. A. 231.

The order is reversed, and an order in accordance with this opinion may be presented on three days' notice.